# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| JILL NATION, | ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) Case No. 3:22-cv-05063-MDH |
| THOMAS E. MOORE, DDS, et. al., | ) ) ) ) |
| Defendants. | ) |

## ORDER

Before the Court are five *Daubert* motions, three from Defendants and two from Plaintiff. Defendants seek to exclude testimony from Dr. John Truitt, DDS; Dr. Melynda Meredith, DDS; and Dr. Karl Jobst, DDS. Plaintiffs seek to exclude testimony from Dr. M. Anthony Pogrel, M.D. and Dr. Robert Miller, DDS. For reasons herein, all *Daubert* motions are **DENIED**. Relatedly, Defendants' Motion for Hearing on Defendants' *Daubert* Motions (Doc. 88) is **MOOT**.

## BACKGROUND

This matter generally involves allegations of negligent dental care as well as negligent and/or intentional efforts to ensure Plaintiff Jill Nation ("Plaintiff") could not obtain medical records. Specifically, Plaintiff alleges that a 2015 softball accident caused Plaintiff to lose one of her two front teeth. Plaintiff was fifteen years old at the time of the incident. Plaintiff then sought dentistry and orthodontic care from Dr. Thomas E. Moore ("Dr. Moore") at his clinic in Nevada, Missouri. Plaintiff contends Dr. Moore advised Plaintiff that, rather than simply replacing a missing front tooth, Plaintiff should undertake a years-long plan to shift all of Plaintiff's upper teeth, so that her left incisor would eventually take the place of the missing front tooth. Once the

1

left incisor became the front tooth, according to Plaintiff's allegations about Dr. Moore's plan, Plaintiff would then be referred to an oral surgeon who would reconstruct the left incisor to appear more akin to a natural front tooth. Plaintiff and Dr. Moore undertook the years-long plan of shifting Plaintiff's upper teeth to accommodate the missing front tooth. Plaintiff began orthodontic care with Dr. Moore during 2015 and Dr. Moore's final adjustment of Plaintiff's braces occurred on or about November 1, 2021. On or about November 9, 2021, Dr. Moore entered into an agreement with Westrock, a group of dental and orthodontics clinics operating in Missouri and Arkansas, whereby Westrock purchased the Corporation and hired Dr. Moore as a Westrock employee.

Plaintiff contends that in November 2021, after about six years of extensive dental work pursuing Dr. Moore's plan, Plaintiff was referred to Dr. Karl Jobst, DDS, in Grove, Oklahoma for cosmetic dentistry needs. Dr. Jobst was "horrified," Plaintiff contends, when he saw the results of Dr. Moore's work. Plaintiff contends that Dr. Moore's work permanently altered Plaintiff's bite, teeth, jaw, and skull, causing pain, distortion, and disfunction. Plaintiff alleges Dr. Jobst advised Plaintiff that she would need extensive dental work in effort to counteract the permanent pain and disfigurement caused by Dr. Moore. Further, Plaintiff alleges that Dr. Moore, the Corporation, and Westrock continually refused to provide Plaintiff with her medical records following repeated requests from Plaintiff and Dr. Jobst. Plaintiff's Amended Complaint alleges six counts altogether: Count One alleges dental negligence against Dr. Moore and the Corporation; Count Two alleges dental negligence against Westrock; Count Three alleges joint enterprise against all Defendants; Count Four alleges conversion against all Defendants; Count Five alleges negligence pertaining to the unavailability of medical records against all Defendants; and Count Six alleges violations of Missouri's Merchandising Practicing Act ("MMPA") against all Defendants. Some of these counts were previously dismissed by this Court's recent summary judgment order.

2

## STANDARD

An expert witness must (1) be qualified by virtue of his or her specialized "knowledge, skill, experience, training or education," (2) provide testimony based on "sufficient facts or data," (3) provide testimony that is "the product of reliable principles and methods," and (4) reliably apply "the principles and methods to the facts of the case." Fed. R. Evid. 702. The "proponent" of the testimony – whether plaintiff or defendant – has "the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." See Fed. R. Evid. 702 advisory committee's note (2000).

The Federal Rules of Procedure, Federal Rules of Evidence, and *Daubert* require more than the statement of an opinion. Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." A retained expert is required to "prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor." Fed. R. Civ. P. 26(a)(2) advisory committee's note (1993).

Under Rule 702, trial courts serve as gatekeepers, "making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 988 (8th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993)). District courts have considerable discretion in ruling on the admissibility of expert testimony and must separate expert opinion evidence "based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Id*. at 989. An expert witness must (1) be qualified by virtue of their specialized "knowledge, skill,

3

experience, training, or education," (2) provide relevant testimony, in that it "assists the trier of fact to understand the evidence or to determine a fact in issue," and (3) provide reliable testimony, in that it is based on trustworthy evidence. FED. R. CIV. P. 702; *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). The proponent of the expert testimony bears the burden of establishing that each of these criteria is met by proving the admissibility of the evidence by a preponderance of the evidence. *Lauzon*, 270 F.3d, at 686. Furthermore, under Rule 403, expert testimony must be excluded where its "probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Miller v. Bayer Healthcare Pharms. Inc.*, No. 4:14-cv-00652-SRB, 2016 U.S. Dist. LEXIS 188485, at *2–3 (W.D. Mo. Nov. 30, 2016).

## DISCUSSION

I. **Dr. John Truitt, DDS**

a. **Dr. Truitt's knowledge, education, training, experience is sufficient to allow Dr. Truitt to testify as an expert as to the orthodontic standard of care**

Defendants contend Dr. Truitt, Plaintiff's retained expert, is unqualified to testify as an expert as to the orthodontic standard of care largely because he is a general dentist, not an orthodontist, and because his formal education is dated, completing dental school in 1967. This Court disagrees. As to the issue of a general dentist opining about matters of orthodontics, the website of the American Orthodontic Society confirms that, "licensed general dentists in the U.S. can provide orthodontic services." Further, Defendants' expert Dr. M. Anthony Pogrel, an oral and maxillofacial surgeon, has testified that no state has laws or regulations to prevent general dentists from providing orthodontic care. Moreover, though Dr. Truitt is a general dentist, his practice

4

involves lecturing on and diagnosing orthodontic-related issues and disorders relevant to this case, particularly those related to temporomandibular disorder (TMD).

In terms of education and experience, Dr. Truitt worked as a general dentist in private practice from around 1967, following graduation from Baylor Dental School, until approximately 1999, after developing arthritis. Dr. Truitt appears to have founded the Clinical Foundation of Orthopedic and Orthodontics, an organization through which Dr. Truitt regularly provides technical lectures and consults on various issues related to general dentistry and, specifically, TMD maxillofacial therapy and orthodontics. Dr. Truitt estimates that he helps to diagnose between fifteen and twenty patients daily through his consulting work, most of whom deal with orthodontic or dentofacial orthopedic issues. Some of these consults appear to take place in person, while others occur remotely. Taken altogether, this indicates Dr. Truitt's education, training, and experience are sufficient to allow Dr. Truitt to opine on issues of the orthodontic standard of care, particularly with respect to issues of TMD.

### b. Dr. Truitt's opinions about replacement of Plaintiff's central incisor are not based on insufficiently reliable methods and speculation

After discussing a Michigan state court case at length, Defendants then analyze perceived inconsistency between peer-reviewed literature and Dr. Truitt's conclusion that it was negligent for Dr. Moore to attempt to move Plaintiff's lateral incisor to the place of the central incisor. In support, Defendants cite a total of five allegedly peer-reviewed articles, none of which purports to be a meta-analysis, published in 2012, 2010, 2006, 2003, and 2001. Defendants attached none of these articles as an exhibit. At best, these articles, some of which seem to be more than twenty years old, appear to make passing reference to a procedure involving the substitution of a lateral incisor for a central incisor. Ostensibly, Defendants believe that the perceived inconsistency between Dr. Truitt's conclusions about Dr. Moore's negligence and passing references in academic

5

literature show that Dr. Truitt has based his opinions on unreliable methods and speculation. Defendants have failed, however, to explain how passing reference to the substitution of a lateral incisor for a central incisor in dated journals constitutes inconsistency with the much narrower conclusion that Dr. Moore's chosen treatment method in Plaintiff's case reflected a departure from the relevant standard of care. Further, Dr. Truitt's deposition testimony does not establish conclusively that his opinions are not based to some extent on relevant academic literature. Dr. Truitt's testimony establishes that he is generally familiar with relevant academic literature and also that throughout his decades-long practice he has never seen someone undertake a procedure like Dr. Moore used on Plaintiff. Accordingly, this Court finds Dr. Truitt's opinions about Dr. Moore's replacement of Plaintiff's central incisor are not based on unreliable methods or speculation.

### c. Dr. Truitt's opinions about Dr. Moore's treatment of Plaintiff's alleged TMJ are not based on unreliable methods and speculation

Defendants next contend that Dr. Truitt's opinion that Dr. Moore acted negligently when he failed to address joint clicking in Plaintiff's jaw was based on unreliable methods. Ostensibly, Defendants contend that Dr. Truitt's methods were unreliable because he failed to adequately consult peer-reviewed literature in reaching his conclusion. As an initial matter, Defendants materially misrepresent Dr. Truitt's conclusion, which appears to be that clicking in one's jaw is pathologic *at age fifteen*. (Doc. 83-2 at ¶ 23). Defendants claim that "the current peer-reviewed literature indicates that a no active treatment of the TMJ is required when there is clicking but no other symptoms." (Doc. 83 at 14). In support, Defendants cite a single publication, nearly a decade old, which Defendants again failed to attach as an exhibit. Nothing cited by Defendants appears to deal with the symptom of jaw clicking among adolescents specifically. Defendants also acknowledge that the cited literature recognizes that TMJ disc displacement can, for some patients,

6

develop into a more serious condition. Defendants fail to establish that Plaintiff's symptomatology, particularly given Plaintiff's relatively young age, fails to require additional investigation beyond the passive monitoring that Defendants claim the literature supports. This is especially troublesome for Defendants' argument where, as here, they entirely fail to address a significant element within Dr. Truitt's opinion, which is that clicking in one's jaw is pathologic *at age fifteen*. More saliently, however, Dr. Truitt's own assessment of Dr. Moore's work is that it was incorrect for Dr. Moore to find that Plaintiff's jaw clicking at age fifteen was "normal," which is altogether separate from whether jaw clicking alone requires additional intervention under the standard of care. (Doc. 83-1 at 8). Further, Dr. Truitt's deposition testimony makes entirely clear that his relevant opinions are based in part on academic publication, in direct opposition to Defendants' contentions. (Doc. 83-1 at 35-36).

> **d. Dr. Truitt's professional background qualifies him to offer opinions on Westrock's failure to engage the Doctor Execuitve Committee and such opinions are based on sufficient and reliable data**

Defendants take issue with Dr. Truitt's opinions regarding Westrock's failure to engage the Doctor Executive Committee advertised on Westrock's website and whether such failure reflects a departure from the standard of care. In relevant briefing, Defendants spend significant time discussing a variety of specific tasks with which Dr. Truitt is inexperienced, such as whether he has "understanding of the due diligence activities performed by a business acquiring another dental practice." (Doc. 83 at 16). Ultimately, however, this appears altogether irrelevant to the main issue at hand, which, as this Court understands it, concerns whether Plaintiff's orthodontic care should have triggered a quality assurance review, and whether such review would have led to some sort of orthodontic intervention for Plaintiff. This issue concerns, not management issues within Westrock, but, chiefly, whether Plaintiff's orthodontic care fell sufficiently outside the
7

standard of care. Dr. Truitt's qualifications discussed earlier, namely his education, professional dental background spanning several decades, and expertise on TMJ related issues, qualifies him to opine on these matters. This is particularly true provided Plaintiff's allegations that she began complaining to Dr. Moore and Westrock about the care she received from Dr. Moore after first visiting Dr. Jobst around the time Westrock completed its purchase of Dr. Moore's practice in November 2021.

For these reasons, Defendants' Motion is **DENIED** as to Dr. Truitt.

## II. Dr. Melynda Meredith, DDS

### a. Dr. Meredith's knowledge, education, training, experience is sufficient to allow Dr. Meredith to testify as an expert in the field of orthodontic care

Defendants bring nearly identical arguments against Dr. Meredith, Plaintiff's non-retained treating dentist, as they did against Dr. Truitt. It appears Dr. Meredith saw Plaintiff as a patient in 2015 before Plaintiff ultimately decided to pursue care with Dr. Moore, as Dr. Moore's practice was located closer to Plaintiff's home.

Defendants' first argument against Dr. Meredith is that she is unqualified to testify as an expert regarding the orthodontic standard of care because she is a general dentist, not an orthodontist. As discussed previously, however, there is no prohibition against general dentists serving as orthodontists. Further, Dr. Meredith's background and experience make it clear that she is qualified to testify as an expert in the area of orthodontic care generally. Dr. Meredith has been a clinical professor of dentistry at the University of Missouri-Kansas City since 2014 and a practice coordinator since 2015. She earned her dentistry degree from the same institution in 2007 and worked in private practice between 2007 and 2014. Dr. Meredith has significant clinical and classroom teaching experience on a variety of topics, including patient care, dental morphology,

and occlusion, all relevant to the specific issues in dispute. Dr. Meredith estimates that she spends approximately eighty percent of her professional time treating patients in a clinical setting, including overseeing dental students treating patients, and the remaining twenty percent of her professional duties are spent in labs with preclinical students. As part of her professional duties, she diagnoses orthodontic issues, but does not personally provide such care. Dr. Meredith's practice emphasizes restorative dentistry, whereby she directs teams of specialists, including orthodontists, to achieve patients' desired outcomes with respect to damaged teeth. Dr. Meredith testified that, as a restorative dentists who leads teams of specialists including orthodontists, she possesses a "foundational basic knowledge" of orthodontics. 45: 16-17. Altogether, though not herself an orthodontist, Dr. Meredith's general dental educational and training background as well as her experience as a professor of dentistry and practician emphasizing restorative dentistry, prove sufficient to allow her to testify as an expert in the field of orthodontic care. Defendants' suggestion that Dr. Meredith's "only experience with orthodontic care and treatment is during dental school" proves unsupported. (Doc. 85 at 6).

### b. Dr. Meredith's opinion regarding central incisor replacement is based on sound methodology and lacks speculation

Defendants restate, nearly verbatim, the same arguments against Dr. Meredith that they brought against Dr. Truitt, concerning the ability to testify that Dr. Moore's method of central incisor replacement is outside the standard of care. Defendants' argument is unpersuasive as to Dr. Meredith for largely the same reasons it was unpersuasive for Dr. Truitt. The academic articles cited, making passing reference to central incisor replacement, do not establish that Dr. Moore's procedure was somehow within the standard of care in Plaintiff's particular situation. Defendants' claim that "Dr. Meredith's opinion on this issue is also inconsistent with the current scientific knowledge and peer reviewed literature" is conclusory and unsupported. (Doc. 85 at 13). As

9

discussed above, Dr. Meredith's qualifications are significant, particularly given her years of experience in academia teaching and practicing in the area of restorative dentistry, which involves her collaborating with and, at times, leading groups of dental providers, including orthodontists, to effect dental outcomes her patients seek. Defendants' argument as to Dr. Meredith's ability to speak as an expert on the issue of central incisor replacement methodology is sound and lacks speculation.

### c. Dr. Meredith's opinion is based on sufficient facts and data

Defendants contend that Dr. Meredith's opinion should be excluded because prior to her deposition testimony she did not review Plaintiff's treatment records apart from those corresponding to Plaintiff's 2015 treatment at the University of Missouri-Kansas City Dental School, prior to undergoing treatment with Dr. Moore. Quite rightly, however, Defendants concede that the factual basis of an expert's testimony typically speaks to weight, not admissibility. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). Nothing about Dr. Meredith's opinion suggests that this case warrants suspension of that general rule.

Defendants' *Daubert* motion as to Dr. Meredith is therefore DENIED.

### III. Dr. Karl Jobst, DDS

#### a. Dr. Jobst is qualified to render expert opinion testimony on issues of orthodontic care

Defendants seek to exclude expert testimony from Dr. Jobst, Plaintiff's treating dentist, based on the same argument brought against Drs. Truitt and Meredith: because Dr. Jobst is a general dentist, he in unqualified to opine on issues related to orthodontic care. This Court disagrees. As discussed previously, there is no prohibition against general dentists serving as orthodontists. Dr. Jobst is a general dentist with his own private practice in Grove, Oklahoma. Dr. Jobst earned his dental degree from the University of Tennessee in 1998 and received additional

10

post-graduate training in anesthesiology from the University of Southern California and in implantology from the University of Oklahoma. At his practice, Dr. Jobst estimates he sees between forty and fifty patients daily. Further, Dr. Jobst, a general dentist, has significant experience treating patients for orthodontic issues. Dr. Jobst estimates that he currently treats around thirty patients for orthodontic care. Dr. Jobst testified that he has significant professional experience with various orthodontic devices and procedures. Dr. Jobst estimates that he has used traditional brackets and wires to move teeth on approximately 200 patients throughout his career. Altogether, this more than sufficiently demonstrates Dr. Jobst is qualified to testify as an expert on orthodontic care.

### b. Dr. Jobst's standard of care opinions as to central incisor replacement are reliable and not speculative

Defendants make nearly identical arguments for why Dr. Jobst's opinions about central incisor replacement for Plaintiff are outside the standard of care, as they did for Drs. Truitt and Meredith. Defendants' argument, including the academic literature cited, which appears to merely reference central incisor replacement, fails to establish that Dr. Moore's treatment of Plaintiff was within the standard of care for Plaintiff's particular situation. Further, the deposition testimony from Dr. Jobst Defendants cite likewise fails to establish that Dr. Moore operated within the standard of care for Plaintiff. (Doc. 87 at 14).

> **Q**: So would you be surprised to learn that orthodontists in CODA certified residency programs are trained to move incisors to replace congenitally missing lateral incisors?
> **A**: Doesn't surprise me.
> **Q**: And that's an accredited program that's teaching people who will be board certified orthodontists to do that treatment, you agree with that, right?
> **A**: Yes.
> **Q**: You simply disagree with it?
> **A**: Yeah.

Doc. 87-1 at 21. Rather, this exchange simply establishes, if anything, that Dr. Jobst is unsurprised that certain orthodontists are taught methods of central incisor replacement and that Dr. Jobst tends to disagree with this method. This is, again, separate from, and arguably unrelated to, the issue of whether Dr. Moore's treatment of Plaintiff's missing incisor was appropriate, given the specific facts of that situation.

### c. Dr. Jobst's opinions as to TMJ are reliable and not speculative

Defendants next argue that Dr. Jobst's opinions and testimony "regarding the standard of care for treatment of a patient's TMJ is directly contradicted by the medical literature" (Doc. 87 at 15). Defendants' argument is largely a repetition of a similar argument made against Dr. Truitt on this same issue, namely that jaw clicking with no additional symptoms never requires an intervention apart from monitoring. Defendants cite Dr. Jobst's testimony indicating that most dentists believe that jaw clicking alone warrants only monitoring, not a larger intervention. (Doc. 87-1 at 22). Again, however, this is separate from the issue of whether the standard of care dictates only monitoring and no other intervention in Plaintiff's unique scenario, especially given Plaintiff's rather young age at the beginning of her treatment. Further, Dr. Jobst's exact opinion on the matter appears to have been muddied by the deposition line of questioning, as Dr. Jobst's answer appears to waver somewhat. While this Court agrees that Dr. Jobst, at one point in the deposition, testified that most doctors would generally only monitor jaw clicking, Dr. Jobst also testified that the standard of care with respect to jaw clicking is to resolve the jaw clicking. (Doc. 87-1 at 22). It is, however, conceivable that these opinions are consistent with one another, should it be that, in Dr. Jobst's opinion, most dentists are failing to deliver an adequate level of care. Regardless, no part of the cited deposition testimony speaks sufficiently to the relevant issue, which is whether Dr. Moore's treatment of Plaintiff's jaw clicking fell within the standard of care.

### d. The particular factual basis for Dr. Jobst's opinion is a matter for the jury

Defendants contend that Dr. Jobst's opinion should be excluded because prior to his deposition testimony he did not review Plaintiff's full treatment record from various providers. It is worth noting, however, that Dr. Jobst's testimony is that he failed to recall whether he reviewed records from certain providers. (Doc. 87-1 at 7). Regardless, Defendants concede that the factual basis of an expert's testimony typically speaks to weight, not admissibility. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). Nothing about Dr. Jobst's opinion suggests that this case warrants suspension of that general rule. Defendants' *Daubert* motion as to Dr. Jobst is therefore **DISMISSED**.

### IV. Dr. M. Anthony Pogrel, M.D.

Plaintiff seeks to exclude testimony from Defendants' expert, Dr. Pogrel, an oral and maxillofacial surgeon at the University of California San Francisco, on two issues: 1) whether Dr. Moore's treatment of Plaintiff's TMJ fell within the standard of care; and 2) whether Plaintiff will require surgery on her jaw. Though styled somewhat differently, Plaintiff's arguments as to both challenged opinions from Dr. Pogel focus on the facts underlying Dr. Pogrel's opinions. As to Dr. Pogrel's opinion that Dr. Moore's treatment of Plaintiff's jaw clicking met the standard of care, Plaintiff objects to her perceived failure of Dr. Pogrel to describe in detail the procedures Dr. Moore used to diagnose and monitor Plaintiff's clicking jaw. Plaintiff claims, "there is simply no evidence to support the basis for Dr. Pogrel's opinions that Dr. Moore properly evaluated and monitored Plaintiff's TMJ click." (Doc. 122 at 5). More specifically, Plaintiff points to Dr. Pogrel's inability to describe in detail how Dr. Moore diagnosed Plaintiff and from where in Plaintiff's jaw the clicking originated. As to Dr. Pogrel's opinion about whether Plaintiff will require surgery,

13

Plaintiff objects to Dr. Pogrel's opinion being based solely on his general experience treating jaw joint issues at the UCSF Orofacial Pain Clinic. At their core, Plaintiff's argument about Dr. Pogrel's opinions concern the sufficiency of the facts about Plaintiff's treatment that underlie Dr. Pogrel's opinions. As discussed before, such a matter is traditionally evaluated by a jury. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). Nothing about Dr. Pogrel's opinion suggests that this case warrants suspension of that general rule. Plaintiff's *Daubert* motion as to Dr. Pogrel is therefore **DENIED**.

### v. Dr. Robert Miller, DDS

Plaintiff seeks to exclude testimony from Dr. Miller as to whether Dr. Moore's treatment of Plaintiff's missing incisor fell within the standard of care. In relevant part, Dr. Miller opines that Dr. Moore's, "treatment plan was a viable and appropriate option that was and is within the applicable standard of care. It is a treatment option that was and is recognized and widely accepted within the field of orthodontics. It is also a treatment plan that is well documented in and supported by peer reviewed literature." (Doc. 124-2 at 3-4). Plaintiff contends that Dr. Miller has no reliable basis for this conclusion apart from his own experience and a single peer-reviewed article. Ultimately, this Court disagrees with Plaintiff. Dr. Miller testified to being a board-certified orthodontist for more than forty years. Though Dr. Miller testified that he has never personally completed the central incisor space closure procedure at issue in this case, he has completed similar procedures involving the movement of canines "hundreds of times." (Doc. 131-3 at 10). This is sufficient to demonstrate that Dr. Miller is qualified to opine on the issue of whether Dr. Moore's treatment of Plaintiff's central incisor closure fell within the applicable standard of care. Plaintiff's *Daubert* motion as to Dr. Miller is therefore **DENIED**.

14

Case 3:22-cv-05063-MDH    Document 136    Filed 07/15/24    Page 14 of 15

## CONCLUSION

For foregoing reasons, all pending *Daubert* motions are **DENIED**. This is a preliminary ruling subject to modification based on evidence admitted at trial. While the various *Daubert* motions raise issues for the jury regarding the weight which shall be assigned to various opinion, each expert is worthy of jury consideration and evaluation.

**IT IS SO ORDERED.**

Dated: July 15, 2024                                             */s/ Douglas Harpool*
                                                                 **DOUGLAS HARPOOL**
                                                                 **United States District Judge**